KELLY-SULLIVAN, INC., and Others, Plaintiffs, *v.* PAUL Moss, as Commissioner of Licenses of the City of New York, and LEWIS J. VALENTINE, as Police Commissioner of the City of New York, Defendants.

Supreme Court, Special Term, New York County, September 23, 1940.

*William A. Hyman* [*Morris A. Wainger* of counsel], for the plaintiffs.

*William C. Chanler, Corporation Counsel* [*Charles C. Weinstein* and *Bernard Friedlander, Assistant Corporation Counsels*, of counsel], for the defendants.

*Milton R. Weinberger*, for The League of New York Theatres, Inc., *amicus curiæ.*

*Paul N. Turner* and *Rebecca Brownstein*, for the Actors Equity Association, *amicus curiæ.*

BERNSTEIN, J. This is an application by the plaintiffs, who are licensed ticket brokers, for a temporary injunction restraining the defendants, the commissioner of licenses and the police commissioner of the city of New York, from enforcing the provisions of chapter 614 of the Laws of 1940, in effect April 18, 1940, which amended article X-B of the General Business Law. The action

itself seeks to procure a judicial declaration that the aforesaid amending statute is unconstitutional, illegal and void, in that it violates the Fourteenth Amendment to the Constitution of the United States and section 6 of article I of the Constitution of the State of New York (the respective due process provisions of those Constitutions), and sections 11, 12 and 13 of article IX of the Constitution of the State of New York (the home rule provisions), and to enjoin the enforcement of the statute permanently. The application here is made upon the complaint and a number of affidavits and is opposed by a number of other affidavits, and the many legal questions involved have been ably presented and briefed not only by counsel for the parties to the action but by counsel who appeared by permission for *amici curiæ*.

Article X-B of the General Business Law was added by chapter 590 of the Laws of 1922 and constituted an attempt by the Legislature of the State to regulate the activities of ticket brokers. It declared that the charges for admission to theatres and other places of amusement was a matter affected with a public interest and subject to supervision of the State to safeguard the public against fraud, extortion, exorbitant rates and similar abuses. It required persons engaging in the business of reselling tickets to obtain a license from the State Comptroller and to file a bond conditioned upon their refraining from violating the provisions of the act. It required owners and operators of theatres and places of amusement to print upon their tickets the price of admission charged by them, and prohibited licensed ticket brokers from reselling such tickets at a price in excess of fifty cents of the price printed thereon. Finally, it made the violation of the provisions of the article a misdemeanor. (Gen. Bus. Law, old §§ 167, 168, 169, 172 and 173.)

On an appeal from a conviction for a violation of the statute of 1922, the Court of Appeals upheld the constitutionality of the statute, including the provision fixing fifty cents as the maximum premium to be charged by ticket brokers. (*People* v. *Weller*, 237 N. Y. 316, 330.) That decision was affirmed by the Supreme Court of the United States in an opinion which expressly pointed out that its affirmance was limited to the only question actually before it, the validity of the licensing provision of the statute, which was separable from the remainder of the act. (*Weller* v. *New York*, 268 U. S. 319.) On an appeal, however, from a judgment of the United States District Court, rendered in a subsequent action to enjoin the enforcement of the statute by both the civil and criminal authorities, the Supreme Court of the United States held so much of the statute as attempted to fix a resale

price of tickets violative of the Fourteenth Amendment to the Constitution. (*Tyson* v. *Banton*, 273 U. S. 418.) This decision was followed by the enactment of chapter 600 of the Laws of 1928, eliminating from the statute all provisions for price-fixing, and, with some minor amendments not pertinent here, article X-B thereafter continued in force and effect as the law regulating ticket brokers until the effective date of the act of 1940.

In November, 1938, a local act was passed by the city council of the city of New York, purporting to amend section B32–5.0 of article 1 of title B of chapter 32 of the Administrative Code of the city by prohibiting the resale of amusement tickets at a premium exceeding seventy-five cents per ticket. The price-fixing provisions of the local act were substantially the same as those which were eliminated from the statute of 1922. The act was vetoed by the mayor of the city of New York as unconstitutional under the authority of *Tyson* v. *Banton* (*supra*), and never became a local law.

As a result of alleged evils and abuses arising from the unbridled resale of theatre tickets, which constitute about ninety-five per cent of all amusement tickets resold in the metropolitan area, and of the public agitation consequent thereon, the League of New York Theatres, Inc., a non-profit membership organization, comprising substantially all of the theatrical producers and theatre operators in the city, with the backing and blessing of the Actors Equity Association, a union chartered by the American Federation of Labor, comprising all of the actors and actresses engaged in the legitimate theatrical profession, undertook to regulate the resale of tickets. This it accomplished by the promulgation of a " Code of Industry Regulations for the sale of theatre tickets of the League of New York Theatres," under which its members agreed to sell or consign tickets only to brokers who were willing to sign an " Agreement and Declaration of Cooperation " with the league to the effect that they would resell their tickets at an advance over the established box office price of seventy-five cents for orchestra or box seats and fifty cents for mezzanine or balcony seats, plus taxes levied by governmental authority. Substantially all the licensed brokers of the city, including the plaintiffs herein, voluntarily signed that agreement with the league, and have been operating thereunder ever since. This arrangement, it is to be noted, was limited to theatre tickets and did not cover the resale of tickets to concerts, operatic performances, baseball and football games, track and field contests, boxing matches or other amusement attractions. A court attack on this code as a conspiracy in restraint of trade and an application for a temporary injunction in

connection therewith followed but proved unsuccessful. (*Atlas* v. *League of New York Theatres, Inc.*, N. Y. L. J. Jan. 18, 1939, p. 266; Id. May 13, 1939, p. 2211.) No question of the constitutionality of any statute, however, was involved in that action.

Chapter 614 of the Laws of 1940, under attack here, is a substantial re-enactment of article X-B of the former General Business Law, as amended, with some minor modifications. The principal changes, in so far as they are involved in this action, are as follows: (1) It transfers the licensing and supervision of the ticket brokerage business to the commissioner of licenses of each political subdivision of the State in which the licensee conducts his business (§ 168). (2) It requires every owner or operator of a theatre or other place of entertainment to print on his tickets the price of admission, as fixed by him, together with an indorsement of the maximum premium (not to exceed seventy-five cents, plus lawful taxes) at which such ticket may be offered for resale; and it makes it unlawful to offer to resell such ticket at a price in excess of the resale price so fixed (§ 169-c). (3) It makes the violation of any provision of the article a misdemeanor punishable by a fine not exceeding $250 or by imprisonment for a period not exceeding one year, or both (§ 169-i).

The plaintiffs' attack on the statute is based specifically on these grounds: *First.* That it attempts to regulate a business not affected with a public interest by price-fixing, and deprives the plaintiffs of their properties without due process of law. *Second.* That its limitation of the premium to a sum not in excess of seventy-five cents per ticket, without regard to the price charged by the owners or operators of the places of amusement and without a consideration of factors of cost, risk, efficiency, etc., that necessarily enter into a proper determination of what constitutes a fair return for services rendered, makes it arbitrary and confiscatory, and deprives the plaintiffs of their property without due process. *Third.* That, while general in terms, it is in effect a local law relating only to the affairs of the city of New York and, as such, it was not passed on the request of the mayor or the city council, as required by sections 11, 12 and 13 of article IX of the State Constitution and is consequently invalid. *Fourth.* That the regulations promulgated by the commissioner of licenses under the statute are drastic and unreasonable.

To focus attention upon the paramount issue raised on this application and arrive at a reasoned determination thereof, the plaintiffs' points of attack may be more appropriately considered in their inverse order.

The regulations promulgated by the commissioner of licenses are attached to the complaint. They do not appear to be either harsh or unreasonable on their face. On the contrary, all but regulation " 5 " are unexceptionable. Although it may merit some of the criticism directed against it, even that regulation represents the considered judgment of the official who is charged with the duty of supervision, and courts and judges may not lightly override that judgment.

The plaintiffs' " home rule " argument is equally untenable. Section 11 of article IX of the State Constitution provides: " The Legislature shall act in relation to the property, affairs or government of any city only by general laws which shall in terms and in effect apply alike to all cities, except upon the request of the mayor of the city affected concurred in by the local legislative body or upon the request of two-thirds of the elected members of the local legislative body declaring that a necessity exists and reciting the facts establishing such necessity and the concurrent action of two-thirds of the members of each house of the Legislature." Section 12 of the same article lodges the power of enacting local laws in the cities themselves. It is undisputed that the statute under attack was passed as a general law, without any request of the mayor or of the council of the city of New York, and it is consequently claimed by the plaintiffs that, inasmuch as there are no ticket brokers licensed in any city of the State other than the city of New York, the statute, though general in terms, is in effect a local law relating to the property, affairs or government of the city of New York, improperly passed as a general law in violation of the constitutional requirement.

On that question it is significant that the statute established no limitation of licensing to any particular city, and that while all the licenses have heretofore been issued only to brokers in the city of New York, if and when a demand for ticket brokerage service should arise in other cities of the State, it is quite conceivable that the licensing would be extended to meet the demand. But even if the statute were primarily designed to safeguard the interests of the millions of inhabitants of the city of New York and of its hundreds of thousands of visitors, the regulation of ticket brokers is itself a matter of State concern in a substantial degree and affects all the people of the State. Where that exists, the enactment of a general law, which in effect is applicable only to a particular municipality, does not contravene the constitutional provision. (*Adler* v. *Deegan,* 251 N. Y. 467; *Robertson* v. *Zimmerman,* 268 id. 52; *New York Steam Corp.* v. *City of New York,* Id. 137.) As Judge CARDOZO expressed it in the first cited case:

" The test is rather this, that if the subject be in a substantial degree a matter of State concern, the Legislature may act, though intermingled with it are concerns of the locality " (p. 491). And as Chief Judge POUND stated it in distinguishing the same case from *Matter of Mayor of New York* (*Elm St.*) (246 N. Y. 72), upon which the plaintiffs rely here so heavily: " Nothing in that decision precludes the Legislature from making a proper classification, based on population, in matters of State concern, although only a single city is predominantly and peculiarly affected thereby " (p. 482).

While the theatre industry is largely centered in the city of New York, it is, like the whole amusement industry with which the statute deals, a matter of substantial State concern. That is evidenced not only by the declaration of public interest embodied in section 167 of the General Business Law, heretofore approved in *People* v. *Weller* (*supra*), but by the numerous regulatory laws relating to the theatre and to other forms of entertainment which have been enacted by the Legislature over a period of many years. (Penal Law, §§ 484, 485, 514, 515, 517, 711, 1140-a, 2074; Education Law, art. 43.) The vital interest in the theatre of non-residents of the city of New York is aptly, though only incidentally, referred to by Judge CRANE in these words: " It has been said, and perhaps truly, that the theatres of New York are maintained almost entirely by the finances of those non-residents who frequent New York during some portion of the year." (*Adler* v. *Deegan, supra,* p. 477.) The degree of interest of localities outside of the municipality principally affected is always a relevant factor in determining the question of State concern (*Matter of Osborn* v. *Cohen,* 272 N. Y. 55, 59), and in the case of the theatre industry, centered in the city of New York and comprising as an incident the resale of theatre tickets, that interest is great indeed.

The plaintiffs' claim of confiscation rests largely upon the contents of their several affidavits. These set forth their business operations for a limited time prior to the enactment of the statute, and indicate in some cases a small profit and in others a small loss, after payment of salaries to the owners or their officers. On the basis of that showing the plaintiffs contend that, if they are compelled to abide by the price limitation fixed by the statute, the financial result of their operations will be disastrous and perhaps cause them to be driven out of business. Since it has been judicially settled that the kind of business conducted by the plaintiffs is a lawful business performing a useful service (*People* v. *Weller, supra*), it is manifest that a statute which will result in depriving the owners of the right to a fair return for their services

must necessarily be held invalid.  (*Near* v. *Minnesota*, 283 U. S. 697; *Forster* v. *Scott*, 136 N. Y. 577.)

The difficulty of the plaintiffs on that score, however, is that their showing of deprivation of a right to a fair return is utterly inconclusive and undependable.  The facts and figures submitted by the several plaintiffs are based on different data and cover different seasons.  They represent but a single year's operation of five of a conceded total of forty-seven licensed brokers.  They do not include the operations of the three largest brokers who, combined, sell between sixty and sixty-five per cent of all the tickets disposed of.  They do not cover variations in the method of operation, in the ability and capacity of the executives and employees, and in the many other elements that properly enter into the item of services.  In short, they fail to show that the profit and loss experience of those five plaintiffs is typical of the industry as a whole.

On the papers before the court, the claim of confiscation is, furthermore, discredited by past performances.  It is in evidence that all the ticket brokers of the city voluntarily subscribed to the code formulated under the National Recovery Act and operated thereunder as long as it was in effect.  It is in evidence that since the fall of 1938 substantially all of them have been operating under the agreement with the League of New York Theatres.  Under both code and agreement, they have resold their theatre tickets (constituting ninety-five per cent of their aggregate sales) at a maximum advance premium of only seventy-five cents per ticket. Since they have continued in business it must be assumed that they have operated their businesses profitably.  It is in evidence, too, that for some of those years one of the largest brokers profitably sold its tickets (constituting ninety-eight per cent of its business) at a maximum advance premium of fifty cents per ticket. In face of those facts, it is inconceivable that the limitation under the statute affecting, if at all, not more than the remaining five per cent of the business of those brokers, could result in confiscation. Certainly no finding can properly be made to that effect in advance of a trial.

This brings us to the point upon which the plaintiffs place their chief reliance in seeking to nullify the act of the Legislature, to wit, the decision of the Supreme Court of the United States in *Tyson* v. *Banton* (273 U. S. 418), rendered in 1927, and holding by a five to four decision that the price-fixing provisions of the statute of 1922 contravened the Fourteenth Amendment to the Constitution.  That decision did not turn on the reasonableness of the price fixed or on the fact that the statute was arbitrary in its operation and effect,

but solely on the legislative attempt to regulate the theatre industry and its appendage, the ticket brokerage business, by means of price-fixing. Hence, unless the principles which underlie that decision have been reconsidered in the later cases of that august court, the statute of 1940, which is a substantial re-enactment of the statute of 1922, must be held unconstitutional.

The crux of that decision is best indicated by Mr. Justice SUTHERLAND, writing for the majority, in this language: "The authority to regulate the conduct of a business or to require a license, comes from a branch of the police power which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, * * * but exists only where the business or the property involved has become ' affected with a public interest ' (quoting the phrase first used by Lord HALE 200 years ago) " (p. 429). After discussing the meaning of the phrase " affected with a public interest " and citing instances of kinds of businesses that it obviously includes and excludes, the prevailing opinion proceeds to place the right of governmental price regulation, aside from cases involving legislation to tide over temporary emergencies, " upon the existence of conditions peculiar to the business under consideration, which bear such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use " (p. 438). And it reaches the conclusion that the business involved in the action is not one affected with a public interest in these words: " A theatre or other place of entertainment does not meet this conception of Lord HALE's aphorism or fall within the reasons of the decisions of this court based upon it " (p. 439).

Although the test thus applied was vigorously rejected by Mr. Justice STONE writing for the minority, and although Mr. Justice HOLMES, concurring in the dissent, tersely remarked that " the notion that a business is clothed with a public interest and has been devoted to a public use is little more than a fiction intended to beautify what is disagreeable to the sufferers " (p. 446), it continued to be the test in all price-fixing decisions rendered by the court for seven years thereafter. (*Ribnik* v. *McBride*, 277 U. S. 350; *Williams* v. *Standard Oil Co.*, 278 id. 235. Cf. *New State Ice Co.* v. *Liebman*, 285 id. 262.) Under that test, the due process clause of the Constitution was consistently and successfully resorted to as a curb on legislation deemed necessary to meet new demands of modern civilization.

Then came the decision in *Nebbia* v. *New York* (291 U. S. 502), rendered in 1934. It was dominated by a new legal philosophy and a changed concept of the test to be applied to legislative enact-

ments involving price-fixing. The court again divided five to four, and evolved a new test of validity. It was this: Does the enactment have a reasonable relation to a proper legislative purpose? If it has, then the courts are without authority to override the act of the Legislature. Said Mr. Justice ROBERTS in laying down this new test: "But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the State from correcting existing maladjustments by legislation touching prices? We think there is no such principle" (p. 531). "It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. * * * The phrase ' affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. * * * But there can be no doubt that upon proper occasion and by appropriate measures the State may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. * * * So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the Legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*" (pp. 536, 537).

This new concept of price-fixing legislation was not based on the facts peculiar to *Nebbia* v. *New York*, for it served as the foundation of later decisions. (*Townsend* v. *Yeomans*, 301 U. S. 441; *United States* v. *Rock Royal Co-op.*, 307 id. 533; *Mayo* v. *Lakeland Highland Canning Co.*, 309 id. 310.) Thus the Supreme Court of the United States has reconsidered and outmoded the two-hundred-year old fiction about businesses " affected with a public interest," and decided that price-fixing is just another form of regulation, which is to be gauged by its relation to the common weal. Thus the minority view in *Tyson* v. *Banton* has become the majority view in *Nebbia* v. *New York*. Thus has been reasserted the necessary predominance of the public interest over private rights of property

and contract, essential to the needs of a newer and more enlightened age.

Counsel for the plaintiffs contend that since the Supreme Court of the United States has directly passed on and declared unconstitutional the price-fixing provision of the substantially similar statute of 1922, its decision must be accepted as the law of the land until it adopts a new ruling. This court is in accord with that contention. Its view of the situation, however, is that our highest court has adopted a new ruling in *Nebbia* v. *New York,* and that such new ruling, being in effect a reversal of its earlier decision, is both controlling and compelling on this court in the instant application. (*Abbye Employment Agency, Inc.,* v. *Robinson,* 166 Misc. 820.)

In the light of the *Nebbia* case and the later decisions referred to, it is evident that the plaintiffs can succeed in their attack upon chapter 614 of the Laws of 1940 on " due process " grounds only if they satisfactorily establish that no evils existed in connection with the sale of tickets, which called for " safeguarding the public against fraud, extortion, exorbitant rates and similar abuses," or, if the evils existed, that the remedy adopted by the Legislature was arbitrary, discriminatory or confiscatory. The plaintiffs have established neither proposition here. Not only has the Legislature pointed to the evils but the courts have furnished bills of particulars of them. (*People* v. *Weller, supra,* p. 331; *Tyson* v. *Banton, supra,* p. 450; *Collister* v. *Hayman,* 183 N. Y. 250, 254.) The testimony adduced in the *Atlas* case, the affidavits submitted by the defendants here, and the strictures directed by the League of New York Theatres and the Actors Equity Association, are replete with evidence of the existence of abuses, which reasonably warranted the intervention of the Legislature in the public interest. And, as has already been pointed out, no facts or circumstances have been disclosed on which to base a finding of confiscation or unfairness in advance of a trial.

The application here seeks not only to enjoin the commissioner of licenses from regulating the plaintiffs' business but also to enjoin the police commissioner from enforcing the criminal provisions of the statute. It has been uniformly held that the hands of the law enforcement authorities may be stayed only where a clear legal right to such relief is established and irreparable injury will result from a denial thereof. (*Reed* v. *Littleton,* 275 N. Y. 150; *Triangle Mint Corp.* v. *Mulrooney,* 257 id. 200.) Obviously no such situation is presented here.

For the reasons stated, the application for a temporary injunction is denied, but plaintiffs may have an early trial of the issues involved herein, if they so desire. Settle order.