Joey GOLD and New York Ticket Brokers, Inc., in behalf of itself and its members, Plaintiffs,

v.

Joseph C. DiCARLO, as Commissioner of Licenses of the City of New York, and Louis J. Lefkowitz, as Attorney-General of the State of New York, Defendants.

United States District Court
S. D. New York.
Nov. 20, 1964.

**818**

Jesse Moss, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, Lester Esterman, David Clurman, New York City, of counsel, for the Attorney General.

Leo A. Larkin, Corp. Counsel of City of New York, New York City, Rose Schneph and Sidney Bremer, of counsel, for Joseph C. DiCarlo.

Before KAUFMAN, Circuit Judge, and BRYAN and MacMAHON, District Judges.

KAUFMAN, Circuit Judge.

Plaintiffs squarely challenge the constitutionality of a New York statute regulating the price at which licensed brokers may re-sell tickets to theatres and other places of public amusement. General Business Law, Art. X–B, Section 169–c. In the face of recent widely-publicized investigations in this area and a long history of legislative concern, Joey Gold, a licensed ticket broker, and New York Ticket Brokers, Inc., a membership corporation of licensed brokers, have brought this class action against the New York City Commissioner of Licenses, Joseph C. DiCarlo, and the State Attorney-General, Louis J. Lefkowitz. They seek to enjoin the defendants from enforcing or attempting to enforce Section 169–c against ticket brokers and also a declaratory judgment that the statute is unconstitutional under the Fourteenth Amendment of the Federal Constitution.

Section 169–c of the New York General Business Law makes it unlawful to re-sell a ticket to a public amusement event at a price more than $1.50, plus lawful taxes, in excess of the maximum price printed on the ticket. The legislative purpose, expressed in Section 167, declares that the admission price for public amusements is "a matter affected with a public interest" and subject to supervision to safeguard the public against fraud, extortion, exorbitant rates and similar abuses.

This three-judge District Court was convened pursuant to 28 U.S.C. § 2284 because the complaint raised a "substantial federal question," under 28 U.S.C. § 2281, particularly since the predecessor of Section 169–c was declared unconstitutional in 1927 by a closely divided United States Supreme Court in Tyson & Brother v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718, which has never been explicitly overruled.

We hold that the purpose of Section 169–c is within the power of the New York legislature and that the means chosen to effect that purpose—the regulation of ticket brokers' re-sale prices—are reasonable and constitutional. Accordingly, the request for equitable relief against the state and city enforcement machinery must be denied.

■ We note, at the outset, that the complaint presents a justiciable controversy. On May 18, 1964, Gold was arraigned in New York City Criminal Court on a 39-count information charging violations of Section 169–c. Previously, he had been summoned by the Commissioner of Licenses to show cause why his license should not be suspended or revoked, in part because of alleged violations of Section 169–c. And the Commissioner admits that he is investigating the activities of ticket brokers generally, whom plaintiffs represent in this class action. Because the brokers are under the cloud of imminent investigation and perhaps prosecution, this case is riper for adjudication than the controversy presented by Idlewild Bon Voyage Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). There jurisdiction was taken although the plaintiff had simply been informed by the State Liquor Authority that its business was illegal under state law.

Turning then to the merits, Tyson & Brother v. Banton is only an illusory barrier. The Supreme Court there held that the state lacked power to regulate re-sale prices of theatre and sports tickets because they were not deemed by the Court to be matters "affected with a public interest." But Justice Stone, dissenting, recognized that this approach only begged the question for it simply meant that only those businesses, regulation of which was countenanced by the Court, would be deemed to be affected with a public interest. 273 U.S. at 451, 47 S. Ct. 426. Justice Holmes, also dissented and proposed the much sounder standard that, subject to constitutionally required compensation, a state legislature may regulate any business when it has sufficient force of public opinion behind it. 273 U.S. at 446, 47 S.Ct. 426.

Tyson's fictional test was soon thereafter rejected in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), where the Supreme Court upheld against constitutional challenge a state statute fixing the minimum and maximum retail prices of milk. The Court declared that "the guaranty of due process * * * demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." 291 U.S. at 525, 54 S.Ct. at 510–511. In truth, the Tyson test was obsolescent even when pronounced in 1927. The Nebbia standard portended increased deference by the Court to the growing need for governmental regulation in America's burgeoning industral society.

Nebbia's approach was reaffirmed in Olsen v. Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1944), which upheld a statute regulating the fees charged by employment agencies. The Court there stated, in effect, that Tyson's standard had been discarded. 313 U.S. at 244, 61 S.Ct. 862. And, most recently, in Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963), Justice Black not only declared that Tyson's philosophy had been abandoned, but quoted the rationale of Justice Holmes' dissent in that case with approval. We would be abdicating our judicial responsibility if we waited for the Supreme Court to use the express words "We hereby overrule Tyson," as the plaintiffs contend we should, before recognizing that the case is no longer binding precedent but simply a relic for the constitutional historians. Judges do not have such mechanical or wooden attitudes nor are they devoid of all powers of interpretation, analogy and application of constitutional principles; they and the law must keep pace with our vibrant and

dynamic society and the changes in the law which the courts have pronounced.

■■■ The ticket brokers contend, however, that the merits of the Tyson decision may not be challenged here since, under principles of res judicata, the Attorney-General is bound by Tyson's holding that New York may not regulate the re-sale price of tickets to public amusements. Quite apart from questions whether res judicata is applicable to successor Attorneys-General and whether it is properly invoked by a third party affirmatively rather than defensively, the res judicata argument must fall because the philosophy of Tyson has been so completely repudiated. At least in the constitutional area, the considerations of finality that stand behind the res judicata doctrine must be balanced against and ofttimes give way to government's need to regulate abuses that change with the passage of time. See Kelly-Sullivan, Inc. v. Moss, 174 Misc. 1098, 1107, 22 N.Y.S.2d 491, aff'd, 260 App.Div. 921, 24 N.Y.S.2d 984 (1940); cf. Commissioner v. Sunnen, 333 U.S. 591, 599–601, 68 S.Ct. 715, 92 L.Ed. 898 (1948); 39 Ops.Atty.Gen. 22 (U.S.1937). It would surely be anomalous to hold that forty-nine states have constitutional power to curb grave abuses in the entertainment industry, but that New York—the entertainment capital of the nation—must stand by idly because of the force of an antiquated, legally unsound decision.

■■■ So we come to the ultimate question—is the re-sale price limitation of 169–c unconstitutional under the Fourteenth Amendment? The test of constitutionality is whether the method of regulation embodied in the statute bears a rational relation to a constitutionally permissible objective. Ferguson v. Skrupa, 372 U.S. 726, 733, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (Harlan, J., concurring). In applying the Fourteenth Amendment we must simply determine whether circumstances vindicate the challenged statute as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. The courts no longer resort to the due process clause as a weapon "to strike down state laws, regulatory of business * * * conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

■■■ The ticket brokers urge upon us that Section 169–c is not reasonably related to the legislative purpose expressed in Section 167. They claim that effective price control clearly is not and cannot be expected to be achieved solely by a limitation of their fees, without any restriction on the promoter's or producer's principal charge. But we read the declaration of Section 167 that the admission prices for public amusements are a matter of public interest as an expression of the legislature's concern with the price the public must *ultimately* pay, absent fraudulent manipulations, which of course permits regulation of brokers' re-sale prices. If the legislature thought that such regulation was sufficient to accomplish its objective, it is not for us to say that the prices charged by theatre owners and sports promoters also required regulation; the legislature need not cover the whole field of possible abuses in order to render constitutional a more limited form of regulation. Farmers & Merchants Bank v. Federal Reserve Bank, 262 U.S. 649, 661, 43 S. Ct. 651, 67 L.Ed. 1157 (1923).

■■■ That there have been and still exist abuses nobody doubts. Although Eugene O'Neill's "The Iceman Cometh" has passed from Broadway and off-Broadway, the "iceman" still is a familiar behind-the-scenes figure on the Great White Way. The "ice" he carries, we are told, has not thawed and still represents the tribute paid by some brokers to box-office treasurers in return for allocations of a substantial portion of the choice seats for each performance. The brokers pass on the cost of such "ice" to their customers, in most instances businessmen accommodating out-of-town

clients, and charge prices much higher than the box offices. The legislature and those knowledgeable in the circumstances believed the resultant effects of this situation, not only on those who must pay exorbitant rates to the brokers, but also on the typical theatre-goer and show business in general, cried out for legislative remedy. On the other hand, we are informed that the brokers play a vital role in the entertainment industry, for they sustain the second and third years of the run of a hit show and thereby bring to the industry the bulk of its profits. See J. Keating, "Theater Tickets: Is There a Basis for Hope?," New York Times, November 15, 1964, sec. 2, pg. 1. But the legislative solution in Section 169–c, while it may not entirely eliminate the grave abuses and may not be the perfect remedy, cannot be faulted as unreasonable. See Kelly-Sullivan, Inc. v. Moss, 180 Misc. 3 (1943), 39 N.Y.S. 2d 797; Kelly-Sullivan, Inc. v. Moss, 174 Misc. 1098, 22 N.Y.S.2d 491, aff'd, 260 App.Div. 921, 24 N.Y.S.2d 984 (1940).

Finally, there is no basis for claiming that the statute violates the equal protection clause because it is unfairly discriminatory. It is hornbook law that a person seeking to establish discrimination must show that he belongs to the same class as those allegedly receiving preferential treatment. Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). Here the plaintiffs cannot meet that requirement. Section 169–c operates alike upon all ticket brokers, who certainly fall within a reasonably distinguishable class from theatre owners and boxing promoters for purposes of state regulation. The ticket broker, for example, does not face the competitive hazards of running a theatre, producing shows, and making large capital investments.

We therefore hold that there is no basis for a permanent injunction or a declaration that Section 169–c is unconstitutional. The complaint is dismissed.