226 N.J. Super. 155 (1988)
543 A.2d 997
NEW JERSEY ASSOCIATION OF TICKET BROKERS, PLAINTIFF-APPELLANT, AND BIRN-MAR TICKETS, INC. T/A THE TICKET BOX AND THE TICKET RACK, PLAINTIFF-RESPONDENT,
v.
TICKETRON, A DIVISION OF CONTROL DATA CORP., A DELAWARE CORP., AND THE NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, DEFENDANTS-RESPONDENTS, AND IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF NEW JERSEY, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS-THIRD-PARTY PLAINTIFFS,
v.
RICHARD BIRNBACK AND MICHAEL BIRNS, INDIVIDUALLY AND AS PRESIDENT, OFFICERS, DIRECTORS AND OWNERS OF BIRN-MAR TICKETS, INC., T/A THE TICKET BOX AND THE TICKET RACK, THIRD-PARTY-DEFENDANTS-RESPONDENTS (TWO CASES). NEW JERSEY ASSOCIATION OF TICKET BROKERS, PLAINTIFF-RESPONDENT, AND BIRN-MAR TICKETS, INC. T/A THE TICKET BOX AND THE TICKET RACK, PLAINTIFF-APPELLANT,
v.
TICKETRON, A DIVISION OF CONTROL DATA CORPORATION, A DELAWARE CORPORATION, AND THE NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 12, 1988.
Decided June 30, 1988.
*158 Before Judges MICHELS, GAYNOR and ARNOLD M. STEIN.
Glen J. Vida argued the cause for appellant New Jersey Association of Ticket Brokers.
David A. Biederman argued the cause for appellant Birn-Mar Tickets, Inc.
Andrea M. Silkowitz, Deputy Attorney General argued the cause for respondents Attorney General of New Jersey and State of New Jersey (Andrea M. Silkowitz, of counsel and on the brief).
No briefs were filed by respondents New Jersey Sports Exposition Authority, Ticketron, Richard Birnback and Michael Birns.
The opinion of the court was delivered by GAYNOR, J.A.D.
In these consolidated cases, plaintiffs challenge the validity and application of N.J.S.A. 56:8-26 et seq., the anti-ticket-scalping law enacted in 1983.
Plaintiffs, New Jersey Association of Ticket Brokers (Ticket), an unincorporated association of ticket brokers operating in New Jersey, and Birn-Mar Tickets, Inc. (Birn-Mar), a New Jersey corporation engaged in the business of ticket brokerage, appeal from the summary judgment dismissing those portions of their complaints attacking the constitutionality of the statute and determining that they and third-party defendants, Michael Birns and Richard Birnback, had violated the statute thereby subjecting them to the statutory penalties. On this appeal from judgments entered in the Chancery Division, Ticket renews its constitutional arguments contending the statute violates due process of law, the Commerce Clause of the United States Constitution, the Contract Clause of the United States Constitution, prohibits free choice of occupation, and denies it equal protection as guaranteed by the State and Federal Constitutions. *159 It is also claimed that the existence of disputed issues precluded the granting of a summary judgment. Birn-Mar also challenges the constitutionality of the statute, urging that it violates the substantive due process rights accorded by the Fourteenth Amendment of the United States Constitution and Art. I, para. 1 of the New Jersey Constitution and further that the statute is not reasonable or appropriate to the objective sought by the legislation. We disagree and affirm.
As ticket brokers, plaintiffs individually sell tickets to concerts, sporting events and other entertainments at a premium per ticket, a price in excess of the face value printed on the ticket. The major part of their New Jersey business was the resale of tickets for concerts, Giants' football games and other sporting events staged by the New Jersey Sports & Esposition Authority (NJSEA) at the Meadowlands complex. Assertedly, plaintiffs service a secondary market of those members of the public who are unable to stand in ticket lines because of jobs, school or parental disapproval, or, who do not want tickets months in advance of the event. Tickets for Giants games are obtained from season ticket holders for two or three times the ticket price and concert tickets are purchased from youths who stand in line at premiums of $7 to $25 per ticket. Brokers also allegedly offer expertise in locating prime seat locations.
Statutory control over the resale of tickets commenced with the legislation enacted in 1947 permitting municipalities to enact ordinances regulating this activity. L. 1947, c. 385, codified as N.J.S.A. 40:48-2.18, et seq.[1] Municipalities were authorized to license ticket brokers and to limit the maximum premium upon a resale to $1 plus tax in excess of the original price of the ticket. The enforcement of the ordinance and penalties, not more than $100 for each offense, as well as revocation and suspension of any license were left to the individual municipalities which had enacted the licensing ordinances. *160 The ineffectiveness of municipal regulation prompted a review by the office of the attorney general in 1982 of various ticket scalping complaints. The abuses thus disclosed induced legislative activity resulting ultimately in the enactment of the legislation under attack in the present litigation.
Under N.J.S.A. 56:8-26, et seq., a ticket agent is a "person who is involved in the business of selling or reselling tickets of admission to places of entertainment who charges a premium in excess of the price, plus taxes, printed on the tickets." N.J.S.A. 56:8-26f. A "place of entertainment" is defined as "any privately or publicly owned or operated entertainment facility within the State of New Jersey such as a theater, stadium, museum, arena, racetrack, or other place where performances, concerts, exhibits, games or contests are held and for which an entry fee is charged." N.J.S.A. 56:8-26d. A "person" is defined as a corporation, company, association, society, firm, partnership or joint stock company as well as an individual. N.J.S.A. 56:8-26c. The statute proscribes the reselling of tickets to a place of entertainment by any person without first having obtained a license from the Division of Consumer Affairs to engage in the business of reselling tickets. N.J.S.A. 56:8-27 and 28; N.J.A.C. 13:45A-20.3(a). In addition to the payment of an application fee, currently $300, an applicant is required to file a bond in the amount of $10,000, conditioned upon compliance with the statute and regulations, the payment of all damages occasioned to any person by reason of misrepresentation, fraud, deceit or other unlawful act in connection with the licensed business and the promise that the applicant, his agents or employees, will not be guilty of any fraud or extortion. N.J.S.A. 56:8-30.
A further provision requires that each place of entertainment print the price charged on the face of each ticket and include the price in any advertising for the event. N.J.S.A. 56:8-33. The statute limits the premium chargeable on a resale by providing:

*161 Except for tickets printed prior to the enactment of this act, each ticket shall have endorsed thereon the maximum premium not to exceed 20% of the ticket price or $3.00, whichever is greater, plus lawful taxes, at which the ticket may be resold. No person shall resell, offer to resell, or purchase with the intent to resell a ticket at any premium in excess of the maximum premium as set forth in this act. [N.J.S.A. 56:8-33]
Plaintiffs maintain that the impact of this law is to compel each person interested in attending a public or private entertainment within the State of New Jersey to stand in line or be eliminated from attendance. According to counsel for Ticket, only two licenses had been issued as of December 7, 1984. Plaintiffs claim there is no point in putting up a bond because they can't make a living by selling tickets within the statutory limit, particularly when they must buy concert tickets from Ticketron offices and pay Ticketron a service fee of $1.25 per ticket.
At the time this action began, Ticketron had a contract with NJSEA designating Ticketron as the exclusive agent of NJSEA for the sale of tickets for events in the Brendan Byrne Arena and Giants Stadium. All concert tickets were initially offered first by Ticketron and subsequently at the box office. The contract with Ticketron expired on July 31, 1985 at which time a five-year contract was awarded by NJSEA to Ticket World USA. Chief among the complaints voiced by plaintiffs was their allegation that the tickets from Ticketron do not afford the best seats and that the Ticketron agents and promoters skim off the very best seating for their own uses and purposes, including resale. An opinion of the attorney general declared that Ticketron (and accordingly its successor Ticket World) as agents of the State were exempt from the operation of the licensing statute.
After the effective date of N.J.S.A. 56:8-26, et seq., Birn-Mar began selling tickets to concerts within New Jersey charging a premium within the statutory limit but coupling that with a consultation fee. On January 7, 1984 it offered two tickets to a concert with a face value of $13.50 for $35 each. The ticket agent represented that $18.50 of the $35 purchase price was a *162 consultation fee and requested the buyer to sign a contract which specified that personal services were performed by the agent in selecting the seat, taking into consideration the patron's weight, sex, age, type of crowd, type of music and other factors.
Again on January 20, 1984, two police officers, seeking tickets to the Van Halen concert at the Meadowlands, were offered tickets by an agent at the Birn-Mar Ticket Box, Bergen Mall, for $18 plus a $17 consultation fee and they were asked to sign what was called a waiver form. These two violations in January 1984 formed the basis for the municipal court complaints which plaintiff Birn-Mar sought to restrain by filing suit. As a result of these problems, Birn-Mar claims that it has closed its New Jersey office.
Plaintiffs jointly claim that resale ticket agents serve a vital social and economic function by catering to the needs of those who are unable to stand in line, by offering an excellent choice of seats and by providing a convenience to the public. Without these services assertedly their customers would be forced to use unlawful scalpers. Further, by maintaining permanent places of business within the State they are giving employment to New Jersey residents, paying state and federal taxes and utilizing public utilities.
Plaintiffs further contend that less confiscatory methods are available to curb the alleged abuses. They also claim that the problem of intimidation and harassment can be dealt with by our criminal laws independently of limiting the resale price or outlawing resales, and additionally urge that the problem of stolen tickets should be dealt with by imposing strict sanctions for theft and resale of stolen tickets. Plaintiffs also point out that they agree to be bound for a refund of the purchase price in the event of a cancellation or postponement of any event. While stating that their average selling price is $30 per ticket, plaintiffs do not deny instances of the sale of tickets for $100 each for extraordinary events or for a front row seat at major *163 concerts. However, Ticket's president, David Emerson, an independent ticket agent, contends that the premiums charged by the agents are not exorbitant.

I.
In asserting a substantive due process violation, although not challenging the licensing or bonding requirements of the legislation, plaintiffs claim that the restrictions imposed on the resale of tickets have virtually forced them out of business. Plaintiffs view the statute as too restrictive in this regard, unrelated to the evil designed to be corrected and confiscatory of their business. As supporting authority for this position, plaintiffs rely upon Tyson and Brother-United Theater Ticket Officers, Inc. v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718 (1927). Tyson involved the review of a New York statute which prohibited the resale of tickets for theaters or other places of entertainment at a price in excess of $.50 above the price printed on the ticket. The Court concluded that the power to fix prices existed only where the business or the property had become "affected with a public interest," 273 U.S. at 438, 47 S.Ct. at 431, and having found that the resale of amusement tickets did not affect a public interest, held that the statute was in violation of the due process clause of the Fourteenth Amendment. Id. at 439-441, 47 S.Ct. at 431-432.
Plaintiffs' reliance on Tyson is misplaced as the drift away from the public interest standard enunciated in that case has been so great that it can no longer be considered a controlling authority. In Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the Court, in dealing with the validity of a statute regulating milk prices, found that the concept of "affected with a public interest" was not susceptible of definition. 291 U.S. at 536, 54 S.Ct. at 515. In holding the New York statute fixing $.09 as a price for a quart of milk valid, the Court said that price controls are "unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the *164 Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." 291 U.S. at 539, 54 S.Ct. at 517. The Court thus set new standards for determining whether a statute violated the due process clause of the Fourteenth Amendment:
So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. "Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine." Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 48 L.Ed. 679, 700, 701, 24 S.Ct. 436 [457]. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. [291 U.S. at 537-538, 54 S.Ct. at 516]
The public interest standard of Tyson was deemed discarded by the Court in Olsen v. Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941), in upholding a statute regulating fees charged by employment agencies; and also in Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963), which held valid a Kansas statute declaring the business of debt adjusting unlawful except insofar as it was practiced by lawyers.
Finally, in Gold v. DiCarlo, 235 F. Supp. 817 (S.D.N.Y. 1964), aff'd 380 U.S. 520, 85 S.Ct. 1332, 14 L.Ed.2d 266 (1965), the Supreme Court affirmed the decision of a three-judge district court which upheld a New York statute making it unlawful to *165 sell a ticket in excess of $1.50 more than the price printed on the ticket. The three-judge panel, convened pursuant to 28 U.S.C.A. § 2284, held that the test is whether the method of regulation bears a rational relationship to a constitutionally permissible objective. 235 F. Supp. at 820. In response to the argument that effective price control of tickets cannot be achieved without some restriction on those tickets given promoters or producers, the three-judge panel held that the Legislature need not cover the whole field of possible abuses in order to render constitutional a more limited form of regulation. Ibid.
The majority of other jurisdictions is in accord with Gold v. DiCarlo.[2]See Annotation, "Validity of State or Local Regulation Dealing With Resale of Tickets to Theatrical or Sporting Events," 81 A.L.R.3d 655 (1977). See also State v. Spann, 623 S.W.2d 272, 273 (Tenn. 1981), where the Tennessee Supreme Court held valid a statute which precluded the receipt of any profit on the resale of an entertainment ticket; State v. Major, 243 Ga. 255, 253 S.E.2d 724, 725, 727 (1979), holding valid a Georgia statute restricting the resale of tickets to sporting events to a $1 service charge; People v. Patton, 57 Ill.2d 43, 309 N.E.2d 572, 573-574 (1974), holding valid an Illinois statute restricting the resale price to the face amount of the ticket; People v. Salmon, 125 Misc.2d 221, 478 N.Y.S.2d 780 (Dist.Ct. *166 1984), holding that defendant violated the Ticket's Speculator's Act by selling a ticket for a premium; State v. Youker, 36 Or. App. 609, 585 P.2d 43, 44 (Ct.App. 1978), holding valid a Portland city ordinance restricting scalping at any event held at a municipally owned facility; Kelly-Sullivan, Inc. v. Moss, 174 Misc. 1098, 22 N.Y.S.2d 491 (Sup.Ct. 1940), aff'd 260 A.D. 921, 24 N.Y.S.2d 984 (N.Y. App. Div. 1940), holding a New York statute valid which restricted the resale premium to $.75; People v. Weller, 237 N.Y. 316, 143 N.E. 205 (1924), aff'd sub nom. Weller v. New York, 268 U.S. 319, 45 S.Ct. 556, 69 L.Ed. 978 (1925), which held valid a statute restricting resale to $.50 in excess of the face value of the ticket.[3]
New Jersey has adopted the Nebbia doctrine, embracing its principles to construe not only the federal constitution but parallel provisions of the State Constitution. The New Jersey Constitution (1947), Art. I, par. 1, does not make the constitutionality of governmental price regulation dependent on any public interest determination. See Hutton Park Gardens v. West Orange Town Council, 68 N.J. 543, 560 (1975). Thus it has been stated that the price of cigarettes may validly be regulated, Lane Distrib., Inc. v. Tilton, 7 N.J. 349, 364-368 (1951); and the price of gasoline, Fried v. Kervick, 34 N.J. 68 (1961); and to control the cost of rent, Hutton Park Gardens, 68 N.J. at 560-565. Even prior to the adoption of the 1947 New Jersey Constitution, New Jersey had embraced the principles in Nebbia. State Bd. of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 516-519 (E. & A. 1935) (upholding State regulation of milk prices); Gaine v. Burnett, 122 N.J.L. 39, 43 (Sup.Ct. 1939), aff'd 123 N.J.L. 317 (E. & A. 1939) (upholding regulation of liquor prices).
*167 Legislative enactments regulating prices are "subject to the same narrow scope of review under principles of substantive due process as are other enactments under the police power: could the legislative body rationally have concluded that the enactment would serve the public interest without arbitrariness or discrimination?" Hutton Park Gardens, 68 N.J. at 563-564 (citations omitted). We are satisfied that the enactment of the anti-ticket-scalping statute, N.J.S.A. 56:8-26, et seq., by addressing the abuses found to exist in the reselling of tickets, was reasonably related to a proper legislative purpose and promoted the public welfare without discrimination or arbitrariness. Due process is thus satisfied.

II.
While implicitly acknowledging the existence of a rational basis for the enactment of an anti-ticket-scalping statute, plaintiffs contend that the restrictions imposed upon the resale of tickets is an inappropriate and unnecessary legislative response to the abuses which concededly existed. However, such a contention is insufficient to overcome the statute's presumption of validity. As we learn from Hutton Park Gardens:
Legislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience. Burton v. Sills, supra, 53 N.J. [86] at 95 [(1968)]; Hudson County News Co. v. Sills, supra, 41 N.J. [220] at 228 [(1963)]; Reingold v. Harper, supra, 6 N.J. [182] at 195-96. This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body or which could reasonably be assumed to have been known which would rationally support a conclusion that the enactment is in the public interest. Reingold v. Harper, supra, 6 N.J. at 196; cf. Jamouneau v. Harner, supra. 16 N.J. at [500] 515. The judiciary will not evaluate the weight of the evidence for and against the enactment nor review the wisdom of any determination of policy which the legislative body might have made. [68 N.J. at 564-565]

III.
The further claim that the act is discriminatory in that it does not permit ticket agents a fair rate of return lacks any *168 supporting evidence. No facts or figures were presented to show that the business of ticket brokerage could not operate within the price restrictions set by the Legislature. The lack of such documentation warrants the rejection of this argument. Troy Hills Village v. Parsippany-Troy Hills Tp. Council, 68 N.J. 604, 630 (1975). "Their evidence of expenses was fragmentary and inadequately documented, and they have made no effort to prove what rate of return would be constitutionally required in the present context." Ibid. These observations are equally applicable in the instant case. Plaintiffs have not disclosed the finances of their business. Nor is it clear how their New York operation adds to the overall cost of the business thereby causing a need for higher premiums on tickets for New Jersey events. There is no factual support for the claim that the rate of return, as fashioned by the Legislature, is unreasonable.

IV.
The further claim that the statute is confiscatory is without substance as the application of the statute does not result in a substantial physical invasion of property. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124-125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), reh'g den. 439 U.S. 883, 98 S.Ct. 226, 58 L.Ed.2d 198 (1978). Reliance on Pete v. United States, 531 F.2d 1018, 1031, 209 Ct.Cl. 270 (1976) is misplaced as there the business was compensated only for actual physical loss of business equipment and not for loss of profits. Similarly, the doctrine of inverse condemnation is not available to plaintiffs as it has been held inapplicable to intangible future profits. Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).
The contention that meeting the needs of those who wish to obtain tickets on demand but are unable to, or do not wish to, stand on line, or prefer to use phone or credit charges, serves a useful, public function is an argument which should be addressed *169 to the Legislature, not the courts. See Ferguson v. Skrupa, 372 U.S. at 731-732, 83 S.Ct. at 1031-32.

V.
We also are unpersuaded that the resale of tickets has such an impact on interstate commerce as to render N.J.S.A. 56:8-26, et seq. violative of Art. I, § 8, cl. 3 of the United States Constitution prohibiting burdens on interstate commerce. It is urged that citizens of neighboring states frequent places of entertainment in New Jersey and that the statute "putatively" prohibits "foreign" ticket agents from selling tickets to New Jersey events, even if permitted by the foreign states, thereby impermissibly impacting on interstate commerce. This argument overlooks the express provision of N.J.S.A. 56:8-27a which limits the applicability of the act to the reselling of tickets in New Jersey. That section of the statute provides:
No person shall engage in or continue in the business of reselling tickets for admission to a place of entertainment without:
a. Owning, operating or maintaining an office, branch office, bureau, agency, or other place of business, not including a post office box, for the purpose of reselling tickets in this State....
Moreover, the Constitution does not invalidate all restrictions on commerce, but only those which burden interstate commerce excessively. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); Kassel v. Cons. Freightways Corp., 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981). Pike set forth the general rule for determining the validity of state statutes affecting interstate commerce in the following terms:
Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. Huron Cement Co. v. Detroit, 362 U.S. 440, 443, 4 L.Ed.2d 852, 856, 80 S.Ct. 813 [816] 78 ALR2d 1294. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and *170 on whether it could be promoted as well with a lesser impact on interstate activities.... [397 U.S. at 142, 90 S.Ct. at 847]
Furthermore, the validity of statutes which promote a legitimate governmental interest will be upheld even though they affect interstate commerce. See Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127-128, 98 S.Ct. 2207, 2214-15, 57 L.Ed.2d 91, 101 (1978), reh'g den. sub nom. Shell Oil Co. v. Governor of Maryland, 439 U.S. 884, 99 S.Ct. 232, 58 L.Ed.2d 200 (1978) (where a statute preventing interstate petroleum producers and refiners from participating in local retail markets was deemed not violative) and Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 473, 101 S.Ct. 715, 728, 66 L.Ed.2d 659, 675 (1981), reh'g den. 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981) (which validated an act banning retail sale of milk in plastic containers).
Here, there is no evidence of any interstate sales of tickets to New Jersey entertainment events which would implicate the commerce clause. But even assuming that tickets were normally sold in neighboring states, the resulting burden on interstate commerce would not be so excessive as to constitute an invalidating restriction. Moreover, the several legitimate governmental interests promoted by the legislation cloaks it with validity despite any effect it might have on interstate commerce. The challenge to the statute on this ground therefore must fail.

VI.
The contention that the statute violates Art. I, § 10 of the United States Constitution prohibiting the impairment of contracts lacks substance as there is no allegation of any contractual obligation predating the effective date of the legislation. The prohibition against impairing the obligation of a contract applies only to existing contracts. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, ___, 107 S.Ct. 1232, 1251-52, 94 L.Ed.2d 472, 499-500 (1987); Watson v. Employers Liability Assurance Corp., 348 U.S. 66, 70, 75 *171 S.Ct. 166, 168, 99 L.Ed. 74, 81 (1954), reh'g den. 348 U.S. 921, 75 S.Ct. 289, 99 L.Ed. 722 (1955). Nevertheless, the impairment of a contract will survive a constitutional challenge if it engenders a legitimate exercise of the State's police power. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 243-244, 98 S.Ct. 2716, 2721-22, 57 L.Ed.2d 727 (1978), reh'g den. 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978); U.S. Trust Co. v. New Jersey, 431 U.S. 1, 21-23, 97 S.Ct. 1505, 1517-18, 52 L.Ed.2d 92 (1977) reh'g. den. 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed.2d 1073 (1977). Here, not only is there an absence of a preexisting contract but the exercise of the police power to control ticket prices has been considered legitimate. Gold v. DeCarlo, 235 F. Supp. 817. Thus, plaintiffs attack on the basis of this constitutional issue is completely devoid of merit.

VII.
The argument that plaintiffs' rights under the equal protection clause of the Fourteenth Amendment and Art. I, par. 1 of the New Jersey Constitution have been violated is founded upon the statute's inapplicability to Ticketron, and its successor, Ticket World USA, and to the various nonprofit and political organizations specifically exempted under the act. While originally raised by Birn-Mar in its suit against Ticketron, the issue was abandoned following the unfavorable decision in the trial court. The argument is being advanced by Ticket in the first instance on this appeal.
Initially, we note that sound principles of appellate procedure preclude our consideration of an issue which has not been raised below. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973). However, despite this procedural bar, we are satisfied there is no merit to this contention. The objection to Ticket World USA's position is based upon the contractual arrangement between it and NJSEA, which makes it an agent of the authority for the purpose of selling tickets to events, and not on any discriminatory classification made by the statute. *172 Nor is there any impermissible classification in the exemption of nonprofit organizations and political organizations from the requirements of the act, provided the proceeds of any ticket resales are used for the lawful purposes of the organization. See Regan v. Taxation With Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (congress may distinguish between veterans organizations and other charities as to whether they may or may not lobby); United States v. Maryland Savings Share Ins. Corp., 400 U.S. 4, 6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4, 7 (1970) (classifying only nonprofit mutual insurers organized before a certain date as tax exempt charities was not unconstitutional); Pet Dealers Ass'n v. Div. of Consumer Affairs, 149 N.J. Super. 235, 238-239 (App.Div. 1977), certif. den. 75 N.J. 16 (1977) (sufficient support was demonstrated for limiting the reports of pet sales to dealers alone). No classification, invidious or otherwise, has been shown by Ticket which could form the basis for an equal protection challenge to the subject legislation.

VIII.
Ticket's final point is that the existence of contested facts precluded a summary determination as to the validity of N.J.S.A. 56:8-26, et seq. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954). Assertedly, the disputed issues are (1) that the statute is confiscatory in that the ticket brokers cannot sell tickets at the allowable markup and make any profit, (2) that the markup allowed under the statute, by depriving the brokers of a profit, takes away a property right, and (3) that the ticket brokers could not compete with Ticketron, and subsequently with Ticket World USA, under the marketing strategy and administration created under the statute. Although the legal principle applicable to the grant of a summary judgment is correctly stated, its asserted applicability lacks substance. The claimed disputed issues represent conclusions drawn by Ticket which are unsupported by any facts in the record and thus do not constitute issues of material facts. *173 Moreover, even if the profit-making ability of the independent brokers was significantly reduced, the statute would still be valid for reasons previously set forth. Thus, these unsupported "factual" issues are immaterial to a resolution of the constitutional challenges to the statute. Id. at 73-75.
The order entered December 24, 1984 granting summary judgment in favor of the State of New Jersey and the order entered November 21, 1986 are therefore affirmed.
NOTES
[1] N.J.S.A. 40:48-2.18 was repealed by L. 1983, c. 135, § 14, N.J.S.A. 56:8-26.
[2] The few jurisdictions which have held statutes or ordinances regulating the resale price invalid have done so on the ground that the legislation unreasonably interfered with private business or violated State constitutional provisions. In Kirtley v. State, 227 Ind. 175, 84 N.E.2d 712, 713 (1949), and in Estell v. Birmingham, 51 Ala.App. 462, 286 So.2d 866, 867 (Crim.App. 1973), aff'd 291 Ala. 680, 286 So.2d 872 (1973), the Indiana statute and the Birmingham city ordinance precluded the receipt of any profit. The Indiana court stated that it refused to follow the majority and held that the statute interfered with the liberty and property rights of ticket owners. 84 N.E.2d at 715. The Alabama court held that the ordinance was valid under federal constitutional standards, 286 So.2d at 868, but noted that Alabama did not adopt the Nebbia doctrine completely but applied a narrower standard for due process considerations. Id. at 869.
[3] The affirmance by the United States Supreme Court in Weller was only as to the licensing provisions; the Court declined to determine the validity of the resale price provisions because defendant was convicted for a licensing failure. 268 U.S. at 325, 45 S.Ct. at 557.