[629 NYS2d 254]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CONCERT CONNECTION, LTD., and JASON BERGER, Appel-
lants.

Second Department, May 22, 1995

---

---

### APPEARANCES OF COUNSEL

*Davidoff & Malito,* New York City *(Matthew Feigenbaum* and *Joan M. Schmidt* of counsel), for appellants.

*Dennis C. Vacco, Attorney-General,* New York City *(Gary Brown* of counsel), for respondent.

### OPINION OF THE COURT

BALLETTA, J.

"Ticket scalping" is the common name given to the practice of selling tickets to popular entertainment events at prices which greatly exceed the established price for those tickets. Considered to be a major source of "fraud, extortion, exorbi-

tant rates and similar abuses" (Arts and Cultural Affairs Law § 25.01), ticket scalping has long been regulated by statute in this State (see, L 1922, ch 590, § 1). Those regulations, now embodied in Arts and Cultural Affairs Law article 25, are currently being challenged by the out-of-State appellants, who argue, essentially, that since they are not present in New York, they should not be subject to New York ticket resale regulations and, further, that such regulations unconstitutionally violate their right to scalp tickets. We disagree and find that the statute was properly applied to the appellants.

Jason Berger is the president of The Concert Connection, Ltd. (hereinafter The Concert Connection), a Connecticut corporation, having its principal place of business in Greenwich, Connecticut. The Concert Connection is engaged in the business of reselling entertainment tickets, including tickets for events at numerous places of entertainment located in New York State. As part of its activities, The Concert Connection advertises in New York newspapers and maintains two New York telephone numbers.

Arts and Cultural Affairs Law § 25.07 (2) makes it "unlawful for any person, firm or corporation to resell or offer to resell any ticket to any place of entertainment for more than the maximum premium price". The maximum premium price is defined as the established printed price plus the greater of $5 or 10% of the established printed price and any lawful taxes (Arts and Cultural Affairs Law § 25.03 [4]).

Executive Law § 63 (12) empowers the Attorney-General to seek an injunction, restitution, and damages against any person who engages in repeated illegal acts. The statute defines "repeated" conduct as the "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person" (Executive Law § 63 [12]).

The Attorney-General's office investigated the activities of The Concert Connection and documented, through transcripts of telephone conversations and affidavits, that The Concert Connection did, on at least three separate occasions, resell tickets for entertainment events taking place in New York to two different individuals, who were both located in New York, for prices far in excess of the maximum premium price. For instance, $20 tickets for the 1992 United States Tennis Open were resold by The Concert Connection for prices between $100 and $300; $15 tickets to New York Yankee baseball games were resold for $45; and $22 to $30 tickets for concerts

at metropolitan arenas were resold for prices of $65 to $300. Based upon these repeated illegal acts, the Attorney-General commenced the instant proceeding in the Supreme Court, Westchester County, to enjoin The Concert Connection and Jason Berger from continuing the illegal "ticket scalping", to require the appellants to pay restitution anddamages to eligible consumers, and to award the State $2,000 costs against each appellant.

The Supreme Court determined that there were no triable issues of fact, denied the appellants' cross motion to dismiss the petition, and granted the petition in its entirety. We now affirm the order and judgment of the Supreme Court.

I

On appeal, The Concert Connection and Jason Berger assert that the court lacked a proper basis for exercising personal jurisdiction over them since neither one is a resident of New York State for jurisdictional purposes.

■ As a general rule, in order for the courts of one State to exercise personal jurisdiction over an individual or corporation located in another State, constitutional due process requires that there be sufficient minimum contacts between that individual or corporation and the forum State such that the latter's assertion of jurisdiction will not offend " 'traditional notions of fair play and substantial justice' " *(International Shoe Co. v Washington,* 326 US 310, 316). The underlying rationale for the "minimum contacts" standard is to protect a defendant from having to litigate in a distant forum and to prevent the individual States from overreaching the judicial limits appropriate to "their status as coequal sovereigns" *(World-Wide Volkswagen Corp. v Woodson,* 444 US 286, 292). Accordingly, personal jurisdiction may be had over a defendant when his "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there" *(World-Wide Volkswagen Corp. v Woodson, supra,* at 297). In this regard, a person who " 'purposefully avails [himself] of the privilege of conducting activities within the forum State' " should be able to reasonably foresee being subjected to jurisdiction there *(World-Wide Volkswagen Corp. v Woodson, supra,* at 297, quoting *Hanson v Denckla,* 357 US 235, 253).

The individual States have enacted a wide variety of so-called "long-arm" statutes to empower their courts to exercise

personal jurisdiction over nondomiciliaries. These statutes may seek to extend the State's jurisdiction to its constitutional limits, as mentioned above, or they may stop at some point short of the full reach of those limits.

In 1979, the New York State Legislature amended New York's own long-arm statute in order to permit the courts in this State to exercise personal jurisdiction over a nondomiciliary who "contracts anywhere to supply goods or services in the state" (CPLR 302 [a] [1]). The Legislative intent was "to abrogate the 'mere shipment' rule established by prior case law (see, e.g., *Kramer v Vogl,* 17 NY2d 27) and * * * to extend New York long-arm jurisdiction to its constitutional limits" *(Island Wholesale Wood Supplies v Blanchard Indus.,* 101 AD2d 878, 879). Under prior case law, personal jurisdiction did "not extend to nondomiciliaries who merely ship[ped] goods into the State without ever crossing its borders" *(McGowan v Smith,* 52 NY2d 268, 271). However, the amended CPLR 302 (a) (1): "is a *'single act statute'* and *proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York,* so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted" *(Kreutter v McFadden Oil Corp.,* 71 NY2d 460, 467 [emphasis added]).

In this case, The Concert Connection contracted, via telephone, to resell tickets to New York residents and thereafter shipped those tickets into New York to those residents. Although the contract was arguably made in Connecticut since the corporate employee was on the telephone in the appellants' Connecticut office *(see, e.g., Greenberg v R. S. P. Realty Corp.,* 22 AD2d 690), this fact does not preclude the exercise of New York's long-arm jurisdiction over the appellants since the statute specifically covers "contracts [made] anywhere to supply goods or services in the state" (CPLR 302 [a] [1]). Thus, when The Concert Connection contracted to send the tickets to purchasers located in New York, it was subjecting itself to personal jurisdiction in New York for any cause of action that arose out of those contracts *(see, Drake Am. Corp. v Speakman Co.,* 144 AD2d 529, 530; *see also, Anderson Dev. Corp. v Isoreg Corp.,* 154 AD2d 859, 860; *Island Wholesale Wood Supplies v Blanchard Indus., supra).*

Moreover, The Concert Connection purposefully availed itself of business opportunities in New York *(see, Hanson v Denckla, supra)* by advertising in New York newspapers,

maintaining two New York telephone numbers, reselling tickets for New York events to New York residents, and actually shipping those tickets into New York, These acts are clearly sufficient to establish the minimum contacts with this State necessary to satisfy the constitutional due process requirements *(see, Anderson Dev. Corp. v Isoreg Corp., supra)* as well as to place The Concert Connection squarely within the reach of this State's long-arm statute.

There can be no doubt that the conduct engaged in by the appellants violated the New York statute prohibiting the reselling of tickets for more than the maximum premium price *(see,* Arts and Cultural Affairs Law § 25.07). Since the tickets that The Concert Connection sold and shipped to New York residents were sold for prices clearly in excess of the maximum premium price, it is clear that the causes of action set forth in the petition of the Attorney-General arose out of the contracts to resell the tickets.

Furthermore, the Supreme Court properly concluded that it had personal jurisdiction over the individual appellant Jason Berger. In *Kreutter v McFadden Oil Corp.* (71 NY2d 460, 468, *supra),* the Court of Appeals rejected the application of the fiduciary shield doctrine to CPLR 302 (a) (1). "Nothing in the statute's language or the legislative history relating to it suggests that the Legislature intended to accord any special treatment to fiduciaries acting on behalf of a corporation or to insulate them from long-arm jurisdiction for acts performed in a corporate capacity" *(Kreutter v McFadden Oil Corp., supra,* at 470). Since the record establishes the existence of sufficient minimum contacts to subject Berger to personal jurisdiction in the New York courts pursuant to CPLR 302 (a) (1), he may not hide behind the corporate entity.

## II

The appellants also challenge the constitutionality of New York's ticket-scalping statute, arguing that it violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Commerce Clause of the Constitution. It is well established that statutory law carries a strong presumption of constitutionality, thereby placing a heavy burden upon the appellants to sustain their challenge to the statute *(see, Matter of Malpica-Orsini,* 36 NY2d 568, 570; *see also, Montgomery v Daniels,* 38 NY2d 41, 54).

The appellants rely mainly upon *Tyson & Brother v Banton*

(273 US 418) in support of their argument that Arts and Cultural Affairs Law § 25.01 *et seq.* violates the Fourteenth Amendment. In *Tyson,* the United States Supreme Court held that the price at which tickets were resold was not "a matter affected with a public interest" *(Tyson & Brother v Banton, supra,* at 429) and, therefore, that the ticket-pricing regulations involved in that case were an unconstitutional application of the State police power that "contravenes the Fourteenth Amendment" *(Tyson & Brother v Banton, supra,* at 445).

However, reliance upon *Tyson* is misplaced. While *Tyson* has not been expressly overruled, the Supreme Court rejected the "affected with a public interest" standard in 1934 in *Nebbia v New York* (291 US 502), stating that the phrase was "not susceptible of definition and form[s] an unsatisfactory test of the constitutionality of legislation directed at business practices or prices" *(Nebbia v New York, supra,* at 536). This holding was reaffirmed in *Olsen v Nebraska* (313 US 236) where the Supreme Court upheld a statute that regulated the fees charged by employment agencies, stating that the standard employed in *Tyson* "was discarded in *Nebbia* v. *New York" (Olsen v Nebraska, supra,* at 245).

The constitutionality of price controls on the resale of tickets was revisited and explicitly upheld in *Gold v DiCarlo* (235 F Supp 817, *affd* 380 US 520). In *Gold,* the plaintiffs brought a class action suit challenging the constitutionality of New York's General Business Law former article 10-B, § 169 (c) (the predecessor statute of Arts and Cultural Affairs Law § 25.01 *et seq.)* and seeking to enjoin its enforcement. In addition to finding that *Tyson* was "no longer binding precedent but simply a relic for the constitutional historians" *(Gold v DiCarlo, supra,* at 819), the court held that *Tyson* could not be invoked as an affirmative res judicata argument "because the philosophy of Tyson has been so completely repudiated" *(Gold v DiCarlo, supra,* at 820). Applying the rational relationship test, the court found that, while the statute "may not be the perfect remedy, [it] cannot be faulted as unreasonable" *(Gold v DiCarlo, supra,* at 821).

The courts in other States have also held that anti-ticket scalping laws do not violate due process *(see, New Jersey Assn. of Ticket Brokers v Ticketron,* 226 NJ Super 155, 543 A2d 997; *State v Major,* 243 Ga 255, 253 SE2d 724; *State v Youker,* 36 Ore App 609, 585 P2d 43, 44). Thus, it is clear that the regulation of ticket sales to protect the public against fraud,

extortion, exorbitant rates, and similar abuses is a legitimate government interest *(see,* Arts and Cultural Affairs Law § 25.01) and does not offend any notions of due process.

■ The appellants' further argument that the statute violates the Equal Protection Clause because it treats various entities differently is equally unavailing. While the statute does distinguish between the resale prices that may be charged by different classes of ticket sellers, it does not distinguish within a given class *(see, Gold v DiCarlo, supra,* at 821). Specifically, the statute treats all ticket brokers alike while exempting certain other classes of people from the application of the "maximum premium price". As the court stated in *Gold:* "[T]here is no basis for claiming that the statute violates the equal protection · clause because it is unfairly discriminatory. It is hornbook law that a person seeking to establish discrimination must show that he belongs to the same class as those allegedly receiving preferential treatment * * * Here the plaintiffs cannot meet that requirement" *(Gold v DiCarlo, supra,* at 821; *see also, Steward Mach. Co. v Davis,* 301 US 548).

The statute permits operators and their agents to impose a service charge that reflects "special services" provided to consumers in making tickets available (Arts and Cultural Affairs Law § 25.29 [1]). This is entirely consistent with the finding in *Gold* that theater owners are to be distinguished from ticket brokers since the latter do not "face the competitive hazards of running a theatre, producing shows, and making large capital investments" *(Gold v DiCarlo, supra,* at 821).

Additionally, the statute exempts persons, firms, or corporations that purchase tickets for their own use or for use by their agents or employees *(Arts and Cultural Affairs Law* § 25.05 [1]). The Legislature recognized that "circumstances occasionally arise that preclude the use of tickets purchased in advance and that people need to recover their expenses" (Arts and Cultural Affairs Law § 25.01) and, therefore, specifically designed the statute to "differentiate between those who would lawfully recover their expenses and those who would gain substantial profits from [the] unlawful reselling of tickets" (Arts and Cultural Affairs Law § 25.01).

The third and final category of exempt ticket sellers is not-for-profit corporations. "[S]o long as any profit realized from ticket reselling is wholly dedicated to the purposes of such

not-for-profit organization", the maximum premium price will not be applied (Arts and Cultural Affairs Law § 25.05 [2]). The fact that "not-for-profit" is defined broadly to include "institution[s] or corporation[s] formed pursuant to the education law" (Arts and Cultural Affairs Law § 25.03 [5]) does not subject the statute to an equal protection challenge, even if some private, profit-making educational institutions are thus exempted. The exemption of not-for-profit organizations is rationally related to the legitimate government interest in the promotion of charitable activities. Thus, so long as the subject entity wholly dedicates the profits realized from the resale of tickets to the purpose for which it was granted "exempt" status, it is acting within the specific exemptions of the statute (see, Arts and Cultural Affairs Law § 25.03 [5]; § 25.05 [1]) and in accordance with the legitimate government interest (see, *New Jersey Assn. of Ticket Brokers v Ticketron,* 226 NJ Super 155, 543 A2d 997, *supra* [exempting nonprofit organizations from requirements of ticket resale statute was not impermissible statutory classification so long as proceeds were used for "lawful purposes" of organization]).

The Commerce Clause argument put forth by the appellants is also without merit. The general rule for determining the constitutionality of a State statute against a Commerce Clause challenge was clearly spelled out in *Pike v Bruce Church, Inc.* (397 US 137, 142): "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits" (see also, *Brown-Forman Distillers v New York Liq. Auth.,* 476 US 573, 579).

Article 25 of the Arts and Cultural Affairs Law regulates evenhandedly and does not seek to regulate activity that occurs wholly outside the State as contended by The Concert Connection. The resale or offering to resell tickets above the maximum premium price is prohibited only in New York. Indeed, the statute expressly states that "governmental bodies charged with enforcement of this article have the authority to regulate the activities of out-of-state resellers *within this state* to the full extent of the state's powers" (Arts and Cultural Affairs Law § 25.01 [emphasis added]). The regulation of the resale of tickets within the State is a legitimate exercise of the State's power to protect the interests of its populace which clearly does not unduly burden interstate commerce.

### III

■ Furthermore, Jason Berger, who is president of The Concert Connection, can also be held personally liable for his actions as an officer of the corporation. In Arts and Cultural Affairs Law § 25.01, the Legislature declared that the price charged "for admission to places of entertainment is a matter of public interest * * * subject to * * * supervision * * * for the purpose of safeguarding the public against fraud, extortion, exorbitant rates and similar abuses". In addition, Executive Law § 63 (12), under which this proceeding was commenced, is aimed at protecting consumers from deceptive and misleading practices and, therefore, broadly defines "fraud" to include any act which could be characterized as dishonest or misleading (see, Matter of Allstate Ins. Co. v Foschio, 93 AD2d 328, 331-332; People v 21st Century Leisure Spa Intl., 153 Misc 2d 938, 943-944). Proof of an intent to defraud is not essential (see, Matter of Allstate Ins. Co. v Foschio, supra; see also, People v Apple Health & Sports Clubs, 206 AD2d 266, 267).

That the corporate veil may be pierced to hold corporate officers personally liable for tortious conduct or knowing participation in fraudulent acts is a well-accepted doctrine (see, e.g., Marine Midland Bank v Russo Produce Co., 50 NY2d 31, 44; La Lumia v Schwartz, 23 AD2d 668, 669). In People v Apple Health & Sports Clubs (80 NY2d 803, 807), which involved a proceeding under Executive Law § 63 (12), the Court of Appeals stated that the individual respondent: "[a]s an officer and director with actual knowledge of and participation in Apple Health's fraudulent and illegal business dealings * * * may be held liable for any money owed to club members and any civil fines owed [to] the State" (emphasis added).

Accordingly, since Berger, as president of the corporation, was aware of the corporation's reselling and offering to resell entertainment tickets "for more than the maximum premium price", he can be held personally liable for the violations of Arts and Cultural Affairs Law § 25.07 (2) (see, People v Apple Health & Sports Clubs, 206 AD2d 266, supra; see also, Matter of State of New York v Daro Chartours, 72 AD2d 872, 873; People v Durch, 140 Misc 2d 353, 356-357). To hold otherwise would be an open invitation to individuals to form shell corporations for the purpose of shielding themselves from liability for illegal business transactions (see also, People v Sakow, 45 NY2d 131, 135-136; Penal Law § 20.25; Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 20.25, at 72).

We have examined the appellants' remaining contentions and find them to be without merit. The order and judgment of the Supreme Court is therefore affirmed, with costs.

MANGANO, P. J., SULLIVAN and MILLER, JJ., concur.

Ordered that the order and judgment is affirmed, with costs.