OPINION OF THE COURT
Bernard J. Fried, J.
Motion sequence Nos. 003 and 004 are consolidated for disposition. In motion sequence No. 003, defendants Johnson Capital Management, Inc. and Michael A. Johnson (together, the Johnson defendants) move, pursuant to CPLR 3211 (a) (7), (8) and 3016 (b) to dismiss the complaint. In motion sequence No. 004, defendants Samaritan Asset Management Services, Inc. and Edward T. Owens (together, the Samaritan defendants) also move, pursuant to CPLR 3211 (a) (7), (8) and 3016, to dismiss the complaint.
Plaintiff, the State of New York, by the Attorney General brings this action alleging that the defendants violated article 23-A of the General Business Law, commonly referred to as the Martin Act, and Executive Law § 63 (12), in that they employed fraudulent means to evade safeguards against “market timing” in the purchase and sale of mutual fund shares. The Attorney General seeks a permanent injunction restraining the defendants from engaging in the sale, purchase or distribution of any mutual funds, and for restitution of monies obtained and damages caused by the defendants’ actions.
“Market timing” is a strategy of rapidly trading in and out of mutual funds in an attempt to exploit brief discrepancies be *671 tween the official stock prices used to determine the value of the mutual fund shares, and the prices at which those stocks are actually trading. Most mutual funds compute their net asset values (NAVs) only once each day, on the basis of the fund’s portfolio value at the close of exchange trading. The market timer may seek to capitalize on the previous days’ NAV and the current upward or downward trend of the market. According to the Attorney General, hedge funds, such as those controlled by the defendants herein, may use computerized trading models to signal when to engage in short-term purchases or sales of mutual funds or, more often, short-term exchanges of money between an equity or bond fund and a money market fund or cash management fund.
Market timing is not illegal. However, market timing can cause damage to long-term shareholders of the mutual fund in several ways. First, market timers increase the transaction costs for the mutual fund. Second, frequent traders profit at the expense of long-term investors, thus diluting the profits of those investors. Third, to raise cash to meet timer redemptions, the mutual fund may incur unnecessary costs associated with drawing down on a fine of credit or selling stocks.
As fiduciaries of their clients, mutual fund managers have an obligation to stop timing activities that increase the funds’ management costs and decrease the value of the shareholders’ investments in the funds. Although mutual funds often maintain practices and policies that seek to identify, monitor and reject timing transactions, identifying these transactions among thousands of legitimate transactions is difficult. Mutual funds may look for large transactions, since market timers trade large dollar amounts to maximize profitability. Mutual funds may also seek to limit the number of trades any one shareholder may execute over a given period.
The Attorney General alleges that market timers, such as the defendants herein, seek to circumvent these obstacles by the use of “omnibus” accounts whereby a brokerage firm bundles all of its customers’ transactions for a particular fund and transmits a single buy or sell order to the mutual fund. The single buy or sell order is thus an aggregation of all of the brokerage firm’s individual customers’ buy and sell orders in that fund, and the mutual fund is unaware of both the customer’s identity and the dollar amount of each trade.
In addition, market timers try to take advantage of the fact that many transactions are not cleared directly with the mutual *672 funds. While some customers purchase and sell shares in direct transactions with the fund company, retirement plans and their beneficiaries typically clear transactions indirectly through a trust company or an intermediary. Most individuals, and many hedge funds, clear mutual fund transactions indirectly through brokerage firms.
The Samaritan defendants are Samaritan, the sponsor, general partner and manager of a group of hedge funds, and Edward Owens, its sole owner and director. Owens formed Samaritan in 1996. After forming Samaritan, Owens established several limited partnerships and limited liability companies operating as hedge funds, including Samaritan Balanced Fund, LP, Samaritan International Equity Fund, LP, Samaritan MultiStrategies Fund, LE Samaritan Global Fund Trading I, LE Samaritan Long/Short Equity Fund LLC, Samaritan Enhanced Equity Fund LLC, and Samaritan Charitable Fund LLC. Samaritan was the general partner of the limited partnerships and the manager of the limited liability companies. According to the Attorney General, Owens found institutions and wealthy individuals to invest in, or “subscribe” to the Samaritan hedge funds. The minimum investment for a subscriber was $500,000, or $1 million, depending on the hedge fund. At one point during the relevant period, Samaritan had approximately $500 million of investors’ funds and borrowed capital under its management. The Attorney General alleges that Owens determined the nature of the investment strategy of the hedge funds that he and Samaritan created and decided that the hedge funds would engage exclusively in mutual fund market timing.
The Johnson defendants are Johnson Capital, a registered investment advisor that, during the period covered by the amended complaint, served as an investment advisor to defendant Samaritan and the Samaritan-sponsored hedge funds. Michael Johnson is the president and an owner of Johnson Capital. In 1997, Samaritan engaged Johnson Capital to act as investment advisor to four of the Samaritan hedge funds, and to create and implement market timing strategies and invest the funds’ assets in accordance with these strategies. The Johnson defendants made trading decisions for approximately half of the assets of the Samaritan hedge funds. In 1998, the Johnson defendants began market timing on behalf of the Samaritan hedge funds, which continued until 2003.
The Attorney General alleges that the defendants utilized two of the above-mentioned strategies to evade the anti-market tim *673 ing countermeasures of the mutual funds. First, were the broker-related methods. According to the complaint, Johnson made trading decisions for approximately half of the assets of the Samaritan hedge funds, and submitted those decisions in the form of “trade orders” through brokers selected by Owens. The trading model used by Johnson required approximately 50 “round trips,” or completed purchases and sales, per year. Owens introduced Johnson to brokerage firms that had “timing capacity” arrangements with mutual funds, or could avoid detection of their clients’ mutual fund market timing by breaking up large trades into small trades, and then making the smaller trades through multiple accounts. By breaking the trades into smaller trades and keeping them below a specified dollar amount, they could “fly under the radar” of the mutual fund market timing defenses. The Attorney General contends that these efforts to evade the mutual fund timing defenses was tortious conduct under the Martin Act and Executive Law § 63 (12).
Second, the Attorney General claims that, starting in 2000, the defendants also attempted to buy, sell and exchange orders through an entity called Security Trust Company, N.A. (STC), a tmst company whose clients consisted of retirement and pension plans. The Attorney General alleges that the defendants placed Samaritan’s timing trades through STC, which then bundled those trades with those of a particular retirement plan client, and submitted them under that client’s account number. This “piggybacking” allowed Samaritan to disguise trades as those of retirement plan participants and avoid having the Samaritan hedge funds’ accounts frozen for timing. In addition to the piggybacking, the Attorney General also alleges that the defendants used other deceptive means, such as employing multiple account numbers and using STC’s name and tax identification number.
The Attorney General alleges four causes of action against defendants: the first, second, and third causes of action allege securities fraud under the Martin Act; the fourth cause of action alleges persistent fraud proscribed by Executive Law § 63 (12).
General Business Law § 352 et seq., commonly referred to as the Martin Act, regulates the offer, sale, purchase and exchange of securities within and from the State of New York. The acts proscribed by the Martin Act include making any false representations, engaging in deception, fraud or false pretense, or *674 concealing any material facts in the sale of securities (General Business Law § 352-c). General Business Law § 353 authorizes the Attorney General to seek a permanent injunction, enjoining any individual or entity, who has taken part in, or has been concerned with, fraudulent practices, from directly or indirectly engaging in the issue or sale of securities within the State of New York, and to seek restitution.
Executive Law § 63 (1) authorizes the Attorney General to ££[p]rosecute ... all actions and proceedings in which the state is interested.” Subdivision (12) of the section provides, in part, that:
“Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages . . . The word ''fraud’ or ‘fraudulent’ as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions” (emphasis added).
The State’s authority under the Martin Act is specifically limited to securities transactions occurring “within or from” the State of New York (General Business Law § 352 [1]). Similarly, the Attorney General’s authority under the Executive Law does not extend to redressing injury to out-of-state residents that has resulted from wrongdoing outside New York, because the State has no interest in those matters (Executive Law § 63 [1]).
Defendants challenge the complaint on several grounds. Defendants first contend that each of the defendants has insufficient contacts with the State of New York to sustain in personam jurisdiction over them, and that the deceptive acts complained of took place outside the State of New York and therefore do not fall under either the Martin Act or Executive Law § 63. Defendants also argue that, even if the court finds that there are sufficient contacts with the State of New York, the defendants did not make any affirmative misrepresentations, and therefore did not commit fraud, and that the At *675 torney General has not pleaded allegations of fraud with the requisite particularity. Defendants also contend that during the time period involved, many of the mutual funds did not prohibit market timing. Defendant Owens alleges that, contrary to the allegations in the complaint, he did not make decisions as to Samaritan’s investments.
As to this last contention, for purposes of a motion to dismiss pursuant to CPLR 3211 (a) (7), the court must accept all of the facts alleged in the complaint as true (Smith v Meridian Tech., Inc., 52 AD3d 685 [2d Dept 2008]). Factual issues, such as whether the mutual funds traded by the defendants prohibited market timing, are not determined on a motion to dismiss.
As to whether defendants’ alleged trading practices violated the Martin Act, although the parties have not cited any New York cases wherein a defendant has been charged with violating the Martin Act as a result of using deception in evading mutual fund market timing restrictions, there are several federal cases, brought by the Securities and Exchange Commission, wherein similar deceptive and evasive actions have been found to constitute a violation of Securities Exchange Act of 1934 § 10 (b) (15 USC § 78j [b]), and 17 CFR 240.10b-5 (see Securities & Exch. Commn. v Druffner, 517 F Supp 2d 502 [D Mass 2007]; Securities & Exch. Commn. v Gann, 2006 WL 616005, 2006 US Dist LEXIS 9955 [ND Tex 2006]).
Section 240.10b-5 (a) of the Rules and Regulations Under the Securities Exchange Act of 1934 prohibits any person from, directly or indirectly, “ employ[ing] any device, scheme, or artifice to defraud” in connection with the purchase or sale of securities. Similarly, New York law prohibits “[a]ny fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale [of securities]” (General Business Law § 352-c [1] [a]). It is well settled that the Martin Act is to be liberally construed, and that “an omission as well as a concealment or suppression of information may be actionable as a fraudulent practice” (State of New York v Rachmani Corp., 71 NY2d 718, 726 [1988], citing People v Federated Radio Corp., 244 NY 33, 38-39 [1926]). Moreover, Executive Law § 63 (12) “broadly defines ‘fraud’ to include any act which could be characterized as dishonest or misleading” (People v Concert Connection, 211 AD2d 310, 320 [2d Dept 1995], appeal dismissed 86 NY2d 837 [1995]). On this basis, the Second Department has held that, as to actions brought under Executive Law § 63 “[p]roof of an intent to defraud is not essential” (211 AD2d at *676 320). The First Department has held that in an action brought pursuant to Executive Law § 63 (12), “the elements of fraud need not be alleged” (People v Coventry First LLC, 52 AD3d 345, 346 [1st Dept 2008]). I find that the allegations in the complaint, that the defendants attempted to evade market timing restrictions by use of various means, including multiple accounts and omnibus accounts, sufficiently allege fraudulent practices as defined by both the Martin Act and .Executive Law §63.
As to the issues of in personam jurisdiction and whether the alleged deceptive acts occurred within the State of New York, defendants assert that they have no connection with New York. Defendants state that Johnson Capital is incorporated in Virginia and has always operated from offices located in Virginia, where all of its officers and employees work and reside. Samaritan and Ed Owens are in Illinois. In addition, STC, the company where defendants are alleged to have piggybacked accounts, is located in Phoenix, Arizona.
According to the defendants, the sole allegation of any connection between any of these transactions and New York is that STC had a clearing relationship with the National Securities Clearing Corporation (NSCC), a private organization that provides processing services to thousands of financial institutions and is located in New York County. Defendants assert that more than 99% of all securities transactions in the United States have clearing and processing services that involve the NSCC, therefore, to allow jurisdiction on this basis alone would be to allow jurisdiction on any securities transaction.
New York’s long-arm statute, CPLR 302 (a) (1), provides, in relevant part that:
“As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
“1. transacts any business within the state or contracts anywhere to supply goods or services in the state . . . .”
Under this statute, proof of a single transaction in New York is sufficient to invoke jurisdiction even where the defendant never physically enters New York, so long as the defendant’s activities in New York were purposeful, and there is a substantial relationship between the transaction and the claim asserted (Opti *677 care Acquisition Corp. v Castillo, 25 AD3d 238 [2d Dept 2005]). Therefore, the defendants’ use of New York brokers to effectuate their trades is sufficient to subject them to New York jurisdiction as to those transactions. Further, insofar as the alleged deceptive acts were effectuated through New York brokers, the State has sufficiently alleged a violation of the Martin Act and the Executive Law, since these involve deceptive acts “within and from” the State of New York (see People v Coventry First LLC, 52 AD3d 345 [2008], supra). However, as to those transactions wherein the defendants used STC, an out-of-state company, to conduct their trades, there are insufficient contacts with the State of New York to either maintain jurisdiction over the defendants or to allege violations of the Martin Act and/or the Executive Law.
Accordingly, based upon the foregoing, it is ordered that defendants’ motion to dismiss is granted to the extent that both the Martin Act and Executive Law causes of action are dismissed as to those transactions involving non-New York brokers, and the motion is otherwise denied.